# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LETICIA C. VILLAFAN,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Case No. 1:17-cv-01229-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 10, 11, 12) |

## I.

## INTRODUCTION

Plaintiff Leticia C. Villafan ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from mental impairments, sleep apnea, headaches, Bell Palsy, hip contusion and strained hamstring, history of asthma, fibromyalgia with unspecified myalgia or myositis and mild obesity. For the reasons set forth below, Plaintiff's Social Security appeal

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 4, 5.)

1

shall be denied.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on June 10, 2013. (AR 172.) Plaintiff's applications were initially denied on September 16, 2013, and denied upon reconsideration on March 11, 2014. (AR 114-118, 121-124.) Plaintiff requested and received a hearing before Administrative Law Judge Teresa L. Hoskins Hart ("the ALJ"). Plaintiff appeared for a video hearing on January 12, 2016. (AR 38-89.) On April 21, 2016, the ALJ found that Plaintiff was not disabled. (AR 17-32.) The Appeals Council denied Plaintiff's request for review on July 14, 2017. (AR 1-3.)

#### A.    Hearing Testimony

Plaintiff appeared and testified at the January 12, 2016 video hearing with her attorney. (AR 39, 42-71, 74-77, 83.) Plaintiff was born in 1965. (AR 83.) Plaintiff graduated from Merced High School in 1984. (AR 44.) Plaintiff attended college part-time for one semester. (AR 45.) She left to start a family and returned to college getting her Associate's Degree in Early Childhood Education in 1999. (AR 45, 51.) At the time she was attending college, Plaintiff worked part-time as a teacher's aide for the Merced School District. (AR 45.) Plaintiff had some vocational training when she worked at McDonald's and in retail stores. (AR 46.)

Plaintiff lives with her husband, two adult daughters, and her daughter's husband. (AR 48.) Plaintiff has had a driver's license since she was 18. (AR 46.) She and her husband share a vehicle. (AR 46.) Plaintiff drives to medical appointments, the pharmacy, and the grocery store. (AR 47.) Plaintiff participates at her church by joining groups and going to Mass. (AR 47.) She reads lectures in front of mass and participates in bible studies. (AR 48.) She used to help with communion three or four years ago, but it got harder for her to be standing. (AR 47-48.) She last participated in a bible study one or two years ago. (AR 48.)

Plaintiff has two grandchildren that live at a separate residence. (AR 74-75.) One of them is almost three and the other is almost two. (AR 75.) They occasionally come to visit her. (AR 75.) Plaintiff does not babysit the grandchildren. (AR 76.)

Plaintiff worked as customer service representative at AT&T Wireless since 2001. (AR 42, 44, 53.) She worked full time for over ten years. (AR 44.) Plaintiff did data entry and was in a desk setting. (AR 43.) She would type, answer calls, take customer problems, and resolve the issues with phones, wireless phones, or billing. (AR 43.) In a typical day, she would lift ten pounds. (AR 43.) Plaintiff was not required to walk or stand more than 2 hours per day. (AR 43.) Her work was done sitting down. (AR 43.) The longest that she would sit would be for three hours and forty-five minutes. (AR 52.) Plaintiff would get up to get faxes. (AR 52-53.) The fax machine was fifty to seventy-five feet away. (AR 53.) Plaintiff did receive state disability for the year after she quit working. (AR 44.)

On a typical day it is hard for Plaintiff in the morning but she pushes herself out of bed around 9:00. (AR 48.) She will have a quick breakfast and then watch television. (AR 48.) She will go into the kitchen and put dishes in the sink. (AR 48.) She will get tired and sit down for one or two hours until her back starts to hurt and will go lie down. (AR 48.) Plaintiff will make a quick lunch. (AR 48.) She gets tired and her hands start hurting so she cannot cook a full meal. (AR 49.) She will go to bed or try to walk a little bit but her back and feet and hands will start hurting. (AR 49.) Plaintiff will take a two-hour nap when she starts hurting and then gets up when her family gets back from work. (AR 49.) Plaintiff will talk to her family members as they do housework. (AR 49.) She takes a few steps back and forth, sits down, and watches television until she goes to bed at nine or nine thirty. (AR 49.)

Plaintiff has been unable to work since April 2012 due to the pain in her hands, shoulder and back. (AR 49.) She cannot sit or walk for long periods of time. (AR 49.) Plaintiff needs to take breaks, sit down, or take a couple of steps. (AR 49.) Plaintiff sweeps but cannot finish. (AR 49.) She will have to take a break because she gets tired. (AR 49.) Plaintiff feels so tired that she cannot lift her hands. (AR 49.) Plaintiff will take a break and sit down for fifteen minutes and then will get up and finish the rest if she is sweeping the whole house. (AR 49.)

Plaintiff also has trouble with concentration. (AR 49-50.) Her memory is foggy and she has mentioned to the doctor that she is afraid she is having Alzheimer's or dementia or something. (AR 50.) She will walk out of a room and completely forget what she was going to

get or what she left behind. (AR 50.) Plaintiff has put water on to boil and burned pots because she was tired. (AR 50.) She will put the water on to boil and then goes to sit down and forgets that it is boiling until she starts smelling something. (AR 50.) The other day she could not remember if she had water boiling and was going to check but could not get off the couch because her feet were hurting so bad. (AR 50.) She started smelling something burning and the pot was on. (AR 50.)

Sometimes when she is talking she will forget what she is saying. (AR 50.) Plaintiff thinks that if she was talking to a customer she would have to ask them to repeat what they were saying. (AR 50.) Before she stopped working she would be typing up what the customer's complaint was and would miss comments. (AR 51.) When a customer calls in they might have more than one problem and she would miss what was being said because she was concentrating on typing the customer's complaint. (AR 51, 63-64.)

Plaintiff cannot work because of concentration, her fingers, and her hands. (AR 51.) She does not have full strength and when she picks something up her hands start hurting, her fingers lock up, and she cannot hold them. (AR 51.) Plaintiff starts exercising them and they get numb and tingle depending on the work that she is doing or the specific time. (AR 51.) Sometimes things must be done fast and she cannot go fast without having pain in her hands, back, and feet. (AR 51.) It does not matter if she is standing or sitting. (AR 51.)

Plaintiff has seen a doctor and been diagnosed with fibromyalgia. (AR 53.) On a typical day, the pain is very bad in the morning when she gets up. (AR 53.) Sometimes she can take medicine for the pain, so it would be six or seven out of ten. (AR 53.) The pain goes down but it is still there throughout the day. (AR 53.) The medicine does not take the pain away and it is a mild continuous pain in her feet and different parts of her body. (AR 53.) She also gets migraines and must lie down. (AR 53.) She will be down for three or four hours because of the light. (AR 53-54.) So, her pain is a five or six all day long. (AR 54.) She will occasionally get flares of pain that are ten out of ten. (AR 54.) Plaintiff will feel like going to the hospital, but will put warm patches on her body to help with the pain. (AR 54.) If she takes medication it does help. (AR 54.) She takes medication for pain and the doctor has her take two when she has

pain flares.  (AR 54.)

Plaintiff takes Tramadol on an everyday basis that is prescribed by Dr. Oestreicher.  (AR 54, 76.)  Dr. Oestreicher prescribes all her medication.  (AR 76.)  She saw a rheumatologist for an evaluation but he told her just to keep taking the medication she was prescribed and to use ibuprofen.  (AR 77.)  When she has a flare she will take ibuprofen.  (AR 54.)  When she has a flare the pain is real severe.  (AR 54.)  Sometimes it even makes her cry.  (AR 54.)  When the pain is a ten, the medication will lower it to an eight.  (AR 54.)  When she takes her medication, she lies down because she will feel dizzy and numb.  (AR 54.)  After taking her medication, Plaintiff goes right to bed.  (AR 55.)

Plaintiff has had migraines since 2000.  (AR 55.)  She had them when she was working.  (AR 55.)  Plaintiff was on medication for her migraines.  (AR 55.)  She still gets migraines and they are not any easier.  (AR 56.)  When she is in pain she loses her concentration.  (AR 56.)  When her family asks her a question, she will tell them she needs to lie down for an hour or two.  (AR 56.)

Plaintiff can sit for half an hour to forty minutes at a time.  (AR 56.)  Then she needs to take a couple steps before she goes back to sit down.  (AR 56.)  Plaintiff can stand forty minutes to an hour.  (AR 56.)  After an hour she will get a bad backache in her lower back and needs to sit down.  (AR 57.)  Plaintiff can lift and carry a gallon of milk, about five pounds, from the refrigerator to the counter.  (AR 57.)  Plaintiff does not have a computer but does have a smartphone.  (AR 57.)  She only uses it for calls from her children.  (AR 57.)  When her kids get a new phone, they give her their old one.  (AR 57.)  Plaintiff has games on her phone, but it is mostly for the grandkids.  (AR 57, 74.)  Plaintiff's hands and wrists hurt a lot.  (AR 58.)  When she tries to make a call, her fingers will lock up or get numb.  (AR 58.)

Plaintiff takes medication daily for anxiety and depression.  (AR 61.)  Plaintiff gets frustrated sometimes because she cannot clean the house.  (AR 58.)  She will see that it is messy and gets depressed.  (AR 58.)  When Plaintiff was working she would get depressed because she was in too much pain after getting home from work to do anything.  (AR 58.)  Sometimes Plaintiff has difficulty going to sleep and takes medication.  (AR 61.)  Plaintiff's medications do

not affect her memory or concentration. (AR 62.) She was having those issues before she started the medication. (AR 62.) Plaintiff thinks the memory and concentration issues are caused by her fibromyalgia. (AR 62.) The doctor did all kinds of testing that came back negative and he said it looked like she was depressed. (AR 62-62.)

Plaintiff sees Vicki Mitchell for mental health treatment. (AR 66.) Plaintiff last saw her in May 2015 because she changed offices. (AR 67, 68.) Plaintiff is going to start looking elsewhere to see if she can get counseling. (AR 67.) She has just been venting with her sisters and family. (AR 67.) Plaintiff has never been seen by Dr. Hernandez. (AR 70.) The only person she ever saw at the clinic was Ms. Mitchell who was an intern marriage and family therapist. (AR 70.)

Plaintiff used to cook Mexican meals and made tortillas by hand. (AR 59.) Plaintiff is not able to make tortillas anymore even though her children ask her to. (AR 59.) Her fingers get numb and the joints and her wrists start to hurt. (AR 59.) Her husband or daughters do the cooking. (AR 59.) When she tries to cut vegetables, her wrists hurt and her fingers go numb. (AR 59.) Plaintiff only makes things that do not take much effort. (AR 59.)

Plaintiff's husband and her daughters do the household cleaning. (AR 59.) Plaintiff tries to help them. (AR 60.) When they do laundry, they will put it on the couch and she will fold it. (AR 60.) She will try to do laundry but if she starts a load she will have do two or three trips to get it to the couch. (AR 60.) She does not want to put too much pressure on her hands by picking up something heavy. (AR 60.)

Plaintiff can drive for around half an hour to forty minutes. (AR 60.) Then she will stop at a store or restaurant and walk around. (AR 60-61.) Plaintiff goes to the grocery store and when she is by herself she tries to just get the basics. (AR 61.) Plaintiff cannot lift heavy items because of her hands. (AR 61.) She will get cereal, bread, maybe ten things. (AR 61.) When they need a lot of items, she will go with her husband or daughter so they can carry the heavy items. (AR 61.)

Plaintiff went to the hospital on December 3 because she was having numbness in her hands and left side and her face felt weird. (AR 64.) She thought she was having a stroke. (AR

64.)  At first Plaintiff thought it was an anxiety attack and would pass.  (AR 64.)  But then her lips started feeling numb.  (AR 64.)  Her daughter told her there was something wrong with her eye, it was not closing and Plaintiff could not feel it.  (AR 64.)  She went to the emergency room and they did tests.  (AR 65.)  They told her she was having a Bell Palsy attack.  (AR 65.)  They gave her medication and she was getting better but still felt a little dizzy.  (AR 65.)

A week or two later, approximately December 21, 2015, Plaintiff slipped and fell.  (AR 65, 66.)  She was walking in the kitchen and her shoe slipped.  (AR 65.)  She tried to hold onto the counter but her hand was not strong enough or she did not get a good grip.  (AR 65.)  Plaintiff feel on the ground and could not get up.  (AR 65.)  She called her daughter to come and help her.  (AR 65.)  When they came they could not get her up because it was so painful, so her son-in-law carried her to the car and they took her to the hospital.  (AR 65.)  They did testing and told her it was the muscles.  (AR 65-66.)

A vocational expert, Judith L. Najarian, also testified at the hearing.  (AR 78, 82-87.)

**B.     ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2017.

- Plaintiff has not engaged in substantial gainful activity since the alleged onset date of April 3, 2012.

- Plaintiff has the following severe impairments: fibromyalgia with unspecified myalgia or myositis and mild obesity.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform light work.

- Plaintiff is capable of performing past relevant work as a customer service representative. This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

- Plaintiff has not been under a disability as defined in the Social Security Act from April

1    3, 2012 through the date of this decision.

2    (AR 22-32.)

3                                    **III.**

4                            **LEGAL STANDARD**

5         To qualify for disability insurance benefits under the Social Security Act, the claimant

6    must show that she is unable "to engage in any substantial gainful activity by reason of any

7    medically determinable physical or mental impairment which can be expected to result in death

8    or which has lasted or can be expected to last for a continuous period of not less than 12

9    months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step

10   sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. §

11   404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th

12   Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is

13   disabled are:

14        Step one: Is the claimant presently engaged in substantial gainful activity? If so,
          the claimant is not disabled. If not, proceed to step two.
15
          Step two: Is the claimant's alleged impairment sufficiently severe to limit his or
16        her ability to work? If so, proceed to step three. If not, the claimant is not
          disabled.
17
          Step three: Does the claimant's impairment, or combination of impairments, meet
18        or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the
          claimant is disabled. If not, proceed to step four.
19
          Step four: Does the claimant possess the residual functional capacity ("RFC") to
20        perform his or her past relevant work? If so, the claimant is not disabled. If not,
          proceed to step five.
21
          Step five: Does the claimant's RFC, when considered with the claimant's age,
22        education, and work experience, allow him or her to adjust to other work that
          exists in significant numbers in the national economy? If so, the claimant is not
23        disabled. If not, the claimant is disabled.

24   Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

25        Congress has provided that an individual may obtain judicial review of any final decision

26   of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g).

27   In reviewing findings of fact in respect to the denial of benefits, this court "reviews the

28   Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

                                          8

disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff argues that the ALJ erred by failing to properly evaluate the medical opinion evidence and by failing to consider Plaintiff's consistent work history in making an adverse credibility finding. Defendant counters that the ALJ offered legally valid reasons, supported by the medical evidence, to reject the physicians' opinions about Plaintiff's inability to work and that the ALJ properly evaluated Plaintiff's testimony.

### A.    The ALJ Provided Clear and Convincing Reasons for Credibility Finding

Plaintiff argues that the ALJ erred by failing to consider her exemplary work history. Defendant counters that the ALJ provided specific, well-supported reasons for rejecting Plaintiff's allegations of disabling symptoms and functional limitations. Further, Defendant contends that since Plaintiff has not challenged the specific reasons provided to support the credibility finding she has waived any argument regarding the ALJ's findings. Finally, Defendant argues that even were the Court to find error due to the failure to consider Plaintiff's

work history, it would be harmless as the ALJ provided other specific and well-supported reasons to reject her testimony.

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted). Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

Then, "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." Brown-Hunter v. Colvin, 806 F.3d 487, 488–89 (9th Cir. 2015). "The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained

failure to seek treatment or to follow a prescribed course of treatment. . . ." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284). The district court is constrained to review those reasons that the ALJ provided in finding the claimant's testimony not credible. Brown-Hunter, 806 F.3d at 492.

       1.   Plaintiff Waived a Challenge to the Specific Credibility Findings

In determining the credibility of Plaintiff's symptom testimony, the ALJ considered:

> The claimant alleges that her physical impairment affects her memory and ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, complete tasks, concentrate, understand, follow instructions, and use her hands. [AR 217, 248, 257 (third party testimony)]. The claimant testified that she is unable to work because of the pain in her hands, shoulders, and back. [AR 49.] She is unable to sit or walk for a long time needs [sic] to take frequent breaks. [AR 49.] The claimant also asserts a foggy memory. [AR 50.] The claimant states she mentioned this to her doctor and that she fears this could be dementia. [AR 50.] The claimant testified that she forgets that she put on a pot to boil water and what was just said to her. [AR 50-51.] The claimant testified that her fingers hurt, get numb, and lock and she cannot hold things too well. [AR 51.] The claimant testified that she has pain when she wakes up in the morning. [AR 53.]
>
> Although the pain starts to go down during the day, the claimant testified that the pain is constantly there. [AR 53.] The claimant testified that she can sit up to 40 minutes at one time and then she needs to get up and take a couple of steps. [AR 56.] The claimant can stand up to 1 hour before her back starts to ache really badly. [AR 57.] She can lift a gallon of milk. [AR 57.] The claimant does not have a computer but uses her children's old smartphones. [AR 57.]

(AR 27-28.)

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity persistence and limiting effects of these symptoms are not entirely accepted as asserted by the claimant for the reasons explained in this decision." (AR 28.) The ALJ noted that while Plaintiff complained of pain all over beginning in January 2012, Plaintiff was only prescribed Ibuprofen from January 25, 2012 until December 7, 2012, when Tramadol was prescribed. (AR 29.) The ALJ also noted that Dr. Oestreicher's treatment notes revealed that Plaintiff's pain was improving and not as severe as she is now alleging. (AR 28.)

> On January 28, 2013, Dr. Oestreicher reported that the claimant's pain was better overall and the claimant's energy level was better. [AR 344.]. On February 28, 2013, the claimant reported that Lyrica was helping with her pain. [AR 346.] In May 2013, the claimant complained of back and hip pain and Effexor help with pain. The claimant reported that she was still very tired and down. [AR 357.] The claimant

also stopped taking Lyrica because of insurance reasons. [AR 357.] In August 2013, the claimant reported having pain all the time. However, Effexor was helpful and she was able to do housework. [[AR 410.] The claimant reported that her migraines were under control. [AR 410.] In September 2013, the claimant reported she was doing about the same. The claimant cut back on her dosage of Effexor and was doing better. The claimant was still having body pain. [AR 406.] In December 2013, Dr. Oestreicher recorded that the claimant reported difficulty doing housework due to fatigue and diffuse pain. [AR 399.] However, the claimant was sleeping 8 hours a day. Lyrica was helping the claimant's pain in her knee shoulder and back, and Tramadol was helping for two hours. [AR 399.]

Likewise, Dr. Oestreicher's treatment notes in 2014 reveal the claimant's fibromyalgia was generally under control with medication. In August 2014, Dr. Oestreicher had a 2-month follow up. Although the claimant complained that she was tired, the claimant reported that the pain was controlled with medication. The claimant was doing some housework. [AR 442.] The claimant was taking Cymbalta for fibromyalgia. The claimant's migraines were stable. [AR 442.] In October 2014, Dr. Oestreicher saw the claimant for a 1-month follow up. [AR 444.] The claimant reported stiffness pain and numbness in her fingers. [AR 446.] However, the claimant reported that she was doing the same and taking Cymbalta. [AR 446.] In December 2014, Dr. Oestreicher saw the claimant for a 2-month follow up. The claimant reported she was still having pain with no real change in her activity level. However, the claimant was walking 1/2 mile on a treadmill twice a week. [AR 452.] Cymbalta was helping with pain. [AR 453.]

(AR 28-29.)

The ALJ found that Plaintiff's statements reflected in the medical record are inconsistent with her allegations. (AR 29.) The ALJ noted that in her August 2, 2013, and January 22, 2014 function reports, Plaintiff stated that she can only walk around ten minutes or 1/4 mile at a time (AR 217, 248); but in September and October 2013, Dr. Parikh reported that Plaintiff walked on the treadmill 2 to 3 miles per week. (AR 29, 487, 490.) On December 10, 2014, Plaintiff reported she was walking 1/2 mile on the treadmill twice a week. (AR 452.) Further, the ALJ found that although Plaintiff alleged constant severe pain in her hands and fingers, the medical record reported that she complained of such pain on only a few occasions which indicates that her finger and hand symptoms are not as severe or as frequent as she contends. (AR 29, 316, 320, 328, 446.) Lastly, the ALJ considered that in being treated for her fall in December 2015 she reported that she had no pain other than muscular pain. (AR 29, 538.) Inconsistent statements may be a clear and convincing reason to reject a claimant's symptom testimony. Tommasetti, 533 F.3d at 1039; see also Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir. 2001), as amended (Nov. 9, 2001) (affirming adverse credibility finding based in part on inconsistent

statements as to why claimant had stopped working); <u>Verduzco v. Apfel</u>, 188 F.3d 1087, 1090 (9th Cir. 1999) (affirming credibility finding where ALJ pointed to several inconsistent statements regarding alcohol use).

The ALJ also found Plaintiff's allegations of "foggy memory" "to be at best partially consistent with the claimant's medical records." (AR 30.) The ALJ considered that while Plaintiff reported memory problems to Dr. Parikh and reported to Dr. Oestreicher that she was worried about losing her memory, none of her treating physicians explored these areas of concern with additional formal testing which indicates that they are not as severe as Plaintiff alleges. (AR 30, 383, 458, 460.) Additionally, the ALJ noted that Plaintiff did not consistently report this issue to her treating physician which indicates that her feeling of "foggy memory" was not as frequent or persistent as she alleges. (AR 30.)

The ALJ also found that Plaintiff's allegations related to her mental impairments are not totally accepted as asserted because they are not consistent with the medical evidence and other record evidence. (AR 24.) Treatment notes from Dr. Oestreicher who was treating Plaintiff for her depression indicate that her condition was well controlled with medication. (AR 24, 311, 320, 480, 483.) Further, in January 2016, Plaintiff reported that she was not being treated for emotional or psychiatric problems and was not depressed. (AR 24, 532.)

Substantial evidence in the record supports the ALJ's finding as review of the medical record shows that none of Plaintiff's treating physicians made any objective findings of depression or anxiety. The determination that a claimant's complaints are inconsistent with clinical evaluations can satisfy the requirement of stating a clear and convincing reason for discrediting the claimant's testimony. <u>Regennitter v. Commissioner of Social Sec. Admin.</u>, 166 F.3d 1294, 1297 9th Cir. 1999). The ALJ properly considered this evidence in weighing Plaintiff's credibility.

Although Plaintiff argues that the ALJ made insufficient credibility findings, she has not challenged any specific finding made by the ALJ. Therefore, Plaintiff has waived any challenge to the specific credibility findings by failing to raise them in her opening brief. <u>Warre v. Comm'r of Soc. Sec. Admin.</u>, 439 F.3d 1001, 1007 (9th Cir. 2006).

2.     Any Alleged Error in Failing to Consider Work History Would be Harmless

Plaintiff argues that the ALJ erred by failing to consider her work history in making the credibility finding and Defendant does not point to any evidence that the ALJ did so, apparently conceding that the ALJ made no such consideration in the opinion.  The ALJ did discuss Plaintiff's work history in finding that Plaintiff was able to perform her past relevant work.  The ALJ noted that Plaintiff had worked as customer service representative and had performed it long enough to be past relevant work.  (AR 31.)

Because symptoms sometimes suggest a greater severity of impairment than can be shown by the medical evidence alone, the regulations provide that other information will be considered in evaluating symptoms.  20 C.C.R. § 404.1529(c)(3).  "We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons."  Id.

Even assuming that the ALJ failed to consider Plaintiff's work history, it would be harmless where, as here, the ALJ provided other clear and convincing reasons to find Plaintiff's testimony not credible.  The ALJ's decision will not be reversed for errors that are harmless.  Burch, 400 F.3d at 679; Molina, 674 F.3d at 1115.

**B.     The ALJ Did Not Err in Evaluating the Medical Opinion Evidence**

Plaintiff contends that the ALJ failed to provide clear and convincing reasons to reject the opinion of her treating physicians, Dr. Oestreicher and Dr. Hernandez.  Plaintiff argues that the ALJ improperly rejected the limitations opined by her treating physicians although the regulations require that they be provided with more weight than a non-treating source.[2]  Plaintiff states that the ALJ relied on her analysis of the raw medical date to reject the opinions of

---

[2] Pursuant to the scheduling order issued September 13, 2017, Plaintiff was required to include a short, separate statement of each of the claimed legal errors stating the insufficiency of the evidence to support a legal finding or reliance on an incorrect legal standard and argument separately addressing each claimed that was supported by citation to legal authority and an explanation of the application of such authority to the facts of this case.  (ECF No. 3 at 4.)  Here, Plaintiff does not challenge any of the specific reasons that the ALJ provided to reject the opinion of Dr. Oestreicher, but merely argues that his opinion should have been given controlling weight.  Plaintiff's counsel is advised that the failure to raise an issue in the opening brief may result in a waiver of the issue.  Warre., 439 F.3d at 1007.

1  Plaintiff's treating providers.

2      Defendant counters that the ALJ proffered legally valid reasons to reject the opinions of

3  Plaintiff's treating physicians and Plaintiff's stated reasons to reject the opinion rests on her

4  desired interpretation of the medical evidence.

5      The weight to be given to medical opinions depends upon whether the opinion is

6  proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d

7  821, 830-831 (9th Cir. 1995). "Generally, the opinions of examining physicians are afforded

8  more weight than those of non-examining physicians, and the opinions of examining non-

9  treating physicians are afforded less weight than those of treating physicians. Orn, 495 F.3d at

10  631 (citing 20 C.F.R. § 404.1527(d)(1)-(2)). While Plaintiff argues that "the Ninth Circuit has

11  long held that medical opinions may not be rejected absent 'clear and convincing reasons[,]' "

12  (Pl.'s Brief in Support of Remand 12), "[i]f a treating or examining doctor's opinion is

13  contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and

14  legitimate reasons that are supported by substantial evidence." Garrison v. Colvin, 759 F.3d 995,

15  1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)). Here, Plaintiff's treating physician

16  opinions are contradicted by the opinions of Dr. De la Rosa who found that Plaintiff had no

17  severe impairments and the functional capacity to perform medium work[3] and Dr. Quint who

18  affirmed the finding that Plaintiff had no severe impairments. (AR 97, 100, 112.) Therefore, the

19  ALJ only needs to provide specific and legitimate reasons that are supported by substantial

20  evidence in the record to reject the treating physician's opinion.

21      1.   Dr. Oestreicher's Opinion

22      Plaintiff argues that the ALJ should have given deference to Dr. Oestreicher's medical

23  source statement since he is the only physician of record who rendered an opinion on Plaintiff's

24  physical limitations. Defendant counters that the ALJ properly found that Dr. Oestreicher's

25  opinion was belied by his own treatment notes and those of Dr. Parikh, the treating

26

27  [3] While Plaintiff argues that no other physician opined on Plaintiff's functional capacity, Dr. De la Rosa did perform
    a residual functional capacity assessment. (AR 99-100.) Dr. De la Rosa found that Plaintiff could occasionally lift
    or carry 50 pounds and frequently lift or carry 25 pounds, stand and/or walk 6 hours in an 8-hour workday; sit 6

28  hours in an 8-hour workday, had unlimited ability to push or pull; and had no other limitations. (AR 99-100.)

rheumatologist.

The ALJ considered that Dr. Oestreicher had treated Plaintiff for her fibromyalgia since 2012. (AR 28.) Plaintiff saw Dr. Oestreicher on January 25, 2012, and she was treated for pain in her neck, shoulders, and hands. (AR 28, 303-305.) Other than some loss of sensation in the left lateral hand, Plaintiff had a normal physical exam. (AR 305.)

Plaintiff had a normal physical exam on March 12, 2012. (AR 309.) Plaintiff was seen on March 28, 2012, and there are no examination findings recorded. (AR 313.)

On June 19, 2012, Plaintiff had a normal physical exam. (AR 316.)

On August 14, 2012, Plaintiff complained of hand numbness and pain all over and was prescribed ibuprofen for the pain. (AR 28, 320.) There are no examination findings recorded. (AR 320.)

On September 12, 2012, Dr. Oestreicher found local tenderness over both forearms with the left greater than the right, but Plaintiff had full range of motion. (AR 28, 324.) Plaintiff was again prescribed ibuprofen for her pain. (AR 28, 324.)

Dr. Oestreicher made these same findings on October 10, 2012, and November 9, 2012, and prescribed the same treatment. (AR 28, 328, 332.)

On December 7, 2012, Dr. Oestreicher again found local tenderness over both forearms, the left greater than right and prescribed Tramadol. (AR 28, 336.)

The ALJ found that the treatment notes in 2013 generally reveal that Plaintiff's pain was improving and not as severe as she currently alleges. (AR 28.) Plaintiff was seen on January 11, 2013, and the same findings were made. (AR 340.) On January 28, 2013, Dr. Oestreicher reported the same findings and that Plaintiff's pain was better overall and her energy level was improving. (AR 28, 344.)

On February 28, 2013, Plaintiff reported that Lyrica was helping with her pain. (AR 28, 348.) She had a normal physical exam. (AR 348.)

On March 28, 2013, Plaintiff had a generally normal physical examination, and reported having a bad side effect with gabapentin which did not help with her pain. (AR 352, 353.)

On May 17, 2013, Plaintiff complained of hip and back pain, but Effexor helped with the

pain.  (AR 28, 357.)  Plaintiff stopped taking Lyrica due to insurance reasons.  (AR 28, 357.)  Plaintiff had a normal physical examination on this date and on July 12, 2013.  (AR 357, 361.)

On August 9, 2013, Plaintiff reported having pain all the time, but that the Effexor was helping and she was able to do housework.  (AR 28, 410.)  Physical examination was normal.  (AR 410.)

On September 6, 2013, Plaintiff reported that she was doing about the same.  (AR 28, 406.)  She had cut back on her use of Effexor and doing better, although she was still having body pain.  (AR 28-29, 406.)  She had a normal physical examination.  (AR 406.)  Plaintiff had a normal physical examination on October 22, 2013.  (AR 403.)

On December 17, 2013, Plaintiff reported difficulty doing housework due to fatigue and diffuse pain, but she was sleeping eight hours a day.  (AR 29, 399.)  The Lyrica was helping the pain in her knee, shoulder, and back, and Tramadol was helping for two hours.  (AR 29, 399.)  No physical examination is recorded.  (AR 399.)

Similarly, the ALJ found that the 2014 treatment notes revealed that her fibromyalgia was generally under control with the use of medication.  (AR 29.)  Dr. Oestreicher provided a medical source statement on July 24, 2014.  (AR 418-420.)

The next record of Plaintiff seeing Dr. Oestreicher is on August 21, 2014.  (AR 439-443.)  Although Plaintiff complained of being tired, she reported that her pain was controlled by medication.  (AR 29, 442.)  She reported that she was doing some housework and was taking Cymbalta.  (AR 29, 442.)  There is no physical examination recorded.  (AR 442.)

Plaintiff saw Dr. Oestreicher on October 9, 2014, and reported stiffness, pain and numbness in her fingers.  (AR 29, 446.)  But she reported that she was doing the same and taking Cymbalta.  (AR 29, 447.)  She was still helping around the house.  (AR 447.)  She had a normal physical examination except for some vaginal dryness.  (AR 47.)

On December 10, 2014, Plaintiff reported that she was having pain with no real change in her activity level.  (AR 29, 452.)  She was walking 1/2 mile on the treadmill twice a week and Cymbalta was helping with pain.  (AR 29, 452, 453.)  Physical examination findings were the same.  (AR 453.)

Plaintiff saw Dr. Oestreicher on April 2, 2015, and complained that her pain was getting worse. (AR 458.) Plaintiff's physical examination finding were the same on this and the next visit of May 14, 2015. (AR 458, 464.)

Plaintiff saw Dr. Oestreicher on September 2, 2015, reporting that everything was the same. (AR 469.) She had a normal physical examination. (AR 469.)

The ALJ considered that on July 27, 2014, Dr. Oestreicher provided a medical source statement, but her rheumatologist did not provide such a statement. (AR 30.) Dr. Oestreicher opined that due to pain and fatigue, Plaintiff could not lift or carry more than five pounds occasionally and could only sit, stand, and walk for one hour each in an eight-hour workday. (AR 30, 418, 419.) Dr. Oestreicher opined that Plaintiff had five percent strength grasping, pushing, and pulling and fine manipulation bilaterally. (AR 30, 419.) Plaintiff was never to crawl, climb, or reach above shoulder level. (AR 30, 420.) Plaintiff could occasionally bend or squat. (AR 30, 420.) Plaintiff would need eight to twelve rest periods during the day. (AR 30, 420.)

### a.      Hand Limitations

The ALJ gave little weight to Dr. Oestreicher's opinion because it was not supported by his treatment notes. (AR 30.) The ALJ found that Plaintiff only complained of finger pain on three occasions and Dr. Oestreicher did not perform any physical examination of Plaintiff's hands to assess her functional limitations. (AR 30.) The ALJ found that Dr. Oestreicher's limitation of five percent grasping, pushing, and pulling and fine manipulation bilaterally was not supported by his treatment record or the record of Plaintiff's treating rheumatologist. (AR 30.) The ALJ's finding that Plaintiff's random reports of hand pain and the lack of any object findings by Dr. Oestreicher do not support the handling and fingering limitations opined is supported by substantial evidence in the record.

As the ALJ stated there are only three reports of finger pain on June 19, 2012; August 4, 2012; and October 9, 2014. (AR 316, 320, 328.) After the July 27, 2014 medical source statement, Plaintiff reported issues with her hand on two other occasions. On October 9, 2014, Plaintiff reported stiffness, pain and numbness in her fingers. (AR 446.) On April 2, 2015,

1  Plaintiff reported that her fingers were locking and she was having stiffness at night. (AR 458.)

2  Further, Dr. Oestreicher's treatment notes are devoid of any physical examination findings or

3  objective testing regarding the opined hand limitations. The ALJ need not accept the opinion of

4  any physician that is brief, conclusory, and unsupported by clinical findings. Thomas, 278 F.3d

5  at 957. Additionally, on all examinations of Plaintiff's hands and wrists, Dr. Parikh recorded 4-

6  5/5 grip strength, normal mobility, and no tenderness. (AR 385, 481, 484, 488, 491.) The ALJ

7  provided a specific and legitimate reason to reject the medical source statement of Dr.

8  Oestreicher.

9         **b.      Limitations Opined Based on Plaintiff's Subjective Complaints**

10        The ALJ also found that Plaintiff lifting, carrying, sitting, standing, and walking

11 limitations appeared to be primarily, if not solely based on Plaintiff's subjective complaints,

12 rather than any physical examination or the recommendation of her treating rheumatologist. (AR

13 21.) Plaintiff was treated by Dr. Parikh, a rheumatologist, for her fibromyalgia.

14        Dr. Parikh first saw Plaintiff on August 1, 2013. (AR 383-386.) Plaintiff had a normal

15 gait and Dr. Parikh reported that her joints show tenderness. (AR 384.) Plaintiff had 17/18

16 tender points on upper and lower extremity examination. (AR 385.) The hips and knees were

17 normal in appearance and mobility with no tenderness. (AR 385.) The hands and wrists were

18 normal in appearance and mobility and were not tender. (AR 385.) Plaintiff grip strength was 4-

19 5/5. (AR 385.) Plaintiff's elbows and forearms were normal in appearance and mobility with no

20 tenderness. (AR 385.) The ankles and feet were normal in appearance and mobility with no

21 tenderness. (AR 385.) Motor function and coordination were within normal limits. (AR 385.)

22 Dr. Parikh informed Plaintiff about available therapies including cognitive-behavioral therapy,

23 strengthening, and stretching. (AR 385.) Dr. Parikh recommended biofeedback, sleep hygiene,

24 regular light aerobic exercise, and proper weight management. (AR 386.)

25        On September 3, 2013, Plaintiff saw Dr. Parikh and reported pain in all joints but was

26 walking two to three miles per week on the treadmill. (AR 490, 491.) Findings on physical

27 examination remained unchanged with normal appearance and mobility with no tenderness in the

28 hips, knees, hands/wrists, elbows/forearms, shoulders, ankles or feet. (AR 491.) Plaintiff

continued to have 4-5/5 grip strength. (AR 491.) Dr. Parikh "strongly recommended daily aerobic exercise." (AR 492.)

On October 4, 2013, Plaintiff continued to complaint of joint and muscle pain but continued to walk two to three miles per week on the treadmill. (AR 488.) She exhibited 13/18 tender points. (AR 488.) But findings on physical examination remained unchanged. (AR 488.) Dr. Parikh again "strongly recommended daily aerobic exercise." (AR489.)

Plaintiff saw Dr. Parikh on November 4, 2013, and was continuing to walk two to three miles per week. (AR 483.) She had 8/18 tender points. (AR 484.) Physical examination findings remained the same. (AR 484.) Dr. Parikh "strongly recommended daily aerobic exercise." (AR 485.)

Plaintiff last saw Dr. Parikh on May 29, 2014, and was not being very compliant with regular/daily exercise. (AR 480.) The importance of daily aerobic exercise and its beneficial effect on fibromyalgia was explained to Plaintiff. (AR 482.) Dr. Parikh "strongly recommended daily aerobic exercise." (AR 482.)

A physician's opinion of disability that is "premised to a large extent upon the claimant's own accounts of his symptoms and limitations" "may be disregarded where those complaints have been 'properly discounted.' " Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999) (quoting Fair v. Bowen, 885 F.2d 597, 605 (1989)). This is especially true in the case of fibromyalgia, a disease that "is diagnosed entirely on the basis of patients' reports of pain and other symptoms." See Benecke v. Barnhart, 379 F.3d 587, 590 (9th Cir. 2004) (fibromyalgia is diagnosed entirely on the basis of a patient's reports of pain and other symptoms and there are no medical tests to confirm the diagnosis). Since the ALJ provided clear and convincing reasons to reject Plaintiff's symptom testimony, this was a specific and legitimate reason to reject Dr. Oestreicher's medical source statement.

As the ALJ identified at least two specific and legitimate reasons to reject the opinion of Dr. Oestreicher, the Court declines to address the further reasons cited by the ALJ, especially where as here, Plaintiff has not challenged them in her opening brief.

**C.    The ALJ Did Not Err in Evaluating the Opinion of Dr. Hernandez**

Plaintiff argues that the ALJ erred by discussing the opinions of Dr. Hernandez and therapist Mitchell in isolation from each other. Plaintiff concedes that the opinion of Dr. Swanson supports the finding that Plaintiff had no mental impairments, but argues that evidence provided after the hearing indicates significant mental impairments that could not be ignored by the ALJ. Further, Plaintiff argues that a reasonable ALJ would have further investigated the matter by obtaining a second consultative examination or testimony from an expert.

Defendant counters that the ALJ properly rejected the opinion of Dr. Hernandez and therapist Mitchell because they lacked objective evidence to corroborate their conclusions and Ms. Mitchell's notes were merely a recitation of Plaintiff's subjective complaints. Defendant also argues that the treatment records of Dr. Oestreicher and Dr. Parikh and the consultative examination of Dr. Swanson and the opinions of the agency physicians all undercut Dr. Hernandez and Ms. Mitchell's conclusions. Defendant contends that the ALJ was not required to further develop the record. Defendant states that Plaintiff has identified no inadequacy or ambiguity in the record and her dissatisfaction with the result does not demonstrate such.

### 1. Dr. Hernandez' Opinions

At step two, the ALJ considered that Plaintiff alleged that her mental impairments contributed to her inability to work. (AR 23.) The ALJ set forth the treatment Plaintiff had received and her evaluation of the evidence in the record in finding that Plaintiff's mental impairments of anxiety and depression were non-severe. (AR 23-26.)

The ALJ considered the August 4, 2014, and August 25, 2014 medical source statements submitted by Dr. Hernandez which stated that Plaintiff met listing 12.06 for anxiety and 12.04 for mood disorder.[4]  (AR 25, 423-426, 429-431.) The ALJ did note that it is unclear if Dr. Hernandez would qualify as an expert as her letterhead identifies her as Ed.D; however, her signature line indicates that she was a Ph.D. (AR 25.) The ALJ found that even if she was an acceptable medical source her opinions were entitled to little weight because she did not provide

---

[4] Although the ALJ states there was one medical source statement dated August 4, 2014, there are two separate statements. The second dated August 25, 2014, however the ALJ referenced both exhibit numbers in the decision so it is clear that the ALJ was addressing both medical source statements.

any treatment notes to support them.  (AR 25.)  Since there were no treatment notes, the ALJ could not determine the accuracy and validity of the opinions.  (AR 25.)  The ALJ also found that the letter co-signed by Ms. Hernandez was given little weight because it is conclusory in nature without evidentiary support in treatment notes or objective evidence to support the finding that Plaintiff could not concentrate on a job due to her depressed mood and pain.  (AR 25, 427.)  Further, the ALJ found that the opinions were inconsistent with other treatment notes of the longitudinal treatment source and the consultative examination by Dr. Swanson as well as the record evidence of longitudinal daily activities for durational periods at issue in this decision.  (AR 25.)

Substantial evidence supports the ALJ's findings that Dr. Hernandez' opinions are not supported by objective findings.  There are no treatment notes from any mental health provider prior to the date that Dr. Hernandez' issued her opinion.  The lack of objective findings or treatment notes is a specific and legitimate reason to reject Dr. Hernandez' opinions.  Thomas, 278 F.3d at 957.

The Court finds no merit in Plaintiff's argument that the ALJ erred by considering Dr. Hernandez' opinion in isolation from Ms. Martinez.  The opinion itself demonstrates that the ALJ did consider the record as a whole, including that Ms. Martinez and Dr. Hernandez co-signed the letter stating that Plaintiff was unable to concentrate.  (AR 25.)  However, the ALJ found that that Ms. Mitchell's treatment notes were of limited value.  (AR 25.)  First, they were for a time period after the opinions issued by Dr. Hernandez.  (AR 25.)  Further, they were at best a recitation of what Plaintiff discussed during their sessions and provided no objective evidence of clinical observations or mental status examinations to access the severity of Plaintiff's depression or anxiety.  (AR 25.)

Ms. Martinez' notes generally recite Plaintiff's complaints and their discussions, including strategies and advice given by Ms. Martinez.  (AR 510-517.)  However, they do not include any objective observations by Ms. Martinez of depression or anxiety, nor do they note any testing to support a finding that Plaintiff had marked limitations in any area of functioning.  Therefore, they do not provide objective evidence to support the findings made by Dr.

Hernandez.

The ALJ also considered that Dr. Oestreicher's treatment records indicated that her depression and anxiety were well controlled on medication and did not include any objective findings to support her allegations. (AR 24, 305, 309, 311, 313, 320, 348, 447, 453, 458.) In fact, the only objective finding of depression in Dr. Oestreicher's notes is on May 14, 2015. (AR 465.) In April 2015, Dr. Oestreicher gave Plaintiff a mini mental examination and she scored 27/30 which indicated only mild cognitive impairment. (AR 24.) Additionally, the ALJ considered the consultative examination by Dr. Swanson which found that, generally, Plaintiff's mental and emotional functioning is unremarkable. (AR 24, 393.) Dr. Parikh consistently reported that Plaintiff's mental and emotional state appeared to be within normal limits. (AR 384, 481, 484, 488, 491.)

The ALJ provided specific and legitimate reasons that are supported by substantial evidence in the record to reject the opinions of Dr. Hernandez.[5]

2. Duty to further develop the record

When applying for disability benefits, the claimant has the duty to prove that she is disabled. 42 U.S.C. § 423(c)(5)(A). The ALJ has an independent "duty to fully and fairly develop the record and to assure that the claimant's interests are considered." Widmark v. Barnhart, 454 F.3d 1063, 1068 (9th Cir. 2006) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)). The ALJ has a duty to further develop the record where the evidence is ambiguous or the ALJ finds that the record is inadequate to allow for proper evaluation of the evidence. Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).

Here, while Plaintiff argues that the after submitted evidence required further development of the record, as the ALJ found, there are no objective findings or testing to substantiate the opinions of Dr. Hernandez or Ms. Mitchell. Additionally, the ALJ considered

---

[5] To the extent that Plaintiff intended to challenge the rejection of the opinion of Ms. Mitchell, an LMFT is not an acceptable medical source. See 20 C.F.R. § 404.1513(d)(1) (2015). Therefore, she is considered an "other source" and the ALJ must give specific reasons germane to the witness in discounting testimony. Molina, 674 F.3d at 1111. Here, the reasons provided to reject the testimony satisfied the specific and legitimate standard as addressed in the discussion of Dr. Hernandez.

the longitudinal treatment notes of Dr. Oestreicher which indicated that Plaintiff's depression and anxiety were well controlled with medication, and the consultative examination by Dr. Swanson which found that, generally, Plaintiff's mental and emotional functioning is unremarkable, she could maintain concentration and functioning in a job setting, had no substantial restrictions in daily functioning, and no difficulties in maintaining social functioning. (AR 393.)

While a specific finding of ambiguity or inadequacy in the record is not required to trigger the necessity to further develop the record, McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011), the facts in this case are not similar to other instances in which the ALJ was found to have such a duty. See Tonapetyan, 242 F.3d at 1150-51 (ALJ erred by relying on testimony of physician who indicated more information was needed to make diagnosis); McLeod, 640 F.3d at 887 (ALJ erred by failing to obtain disability determination from the Veteran's Administration); Bonner v. Astrue, 725 F.Supp.2d 898, 901-902 (C.D. Cal. 2010) (ALJ erred where failed to determine if claimant's benefits were property terminated or should have been resumed after his release from prison); Hilliard v. Barnhart, 442 F.Supp.2d 813, 818-19 (N.D. Cal. 2006) (ALJ erred by failing to develop record where he relied on the opinion of a physician who recognized he did not have sufficient information to make a diagnosis).

The Court finds that the ALJ did not err by failing to further develop the record.

### D. The ALJ Did Consider Factors Listed in 20 C.F.R. § 404.1527(c)

In her reply, Plaintiff argues that the ALJ failed to consider the factors listed in 20 C.F.R. § 404.1527(c). In her opening brief, Plaintiff argued that the ALJ failed to provide specific reasons to reject the opinions of her treating physicians. Plaintiff contended that the opinions of her treating physicians were much more restrictive the residual functional capacity and, based on these opinions, she was not able to complete an eight-hour workday. Plaintiff also argued that the ALJ erred by not giving weight to Dr. Oestreicher's opinion because he was the only doctor who examined Plaintiff and actually treated her. While Plaintiff mentioned section 1527(c)(1) and (c)2, she never presented an argument that the ALJ erred by failing to consider the factors listed in section 404.1527(c) and it is not clear that Plaintiff was challenging the ALJ's decision

on this ground. For the first time in her reply, Plaintiff argues that, to be clear, she was challenging that the ALJ did not consider the factors listed in section 1527(c). In an opening brief, the plaintiff should clearly set forth the basis of the challenges to the ALJ's opinion. Plaintiff is advised that such vague arguments as presented in the opening brief do not clearly place the defendant on notice to address the issue in her opposition. In the future, the Court shall consider such vague challenges to have waived the issue.

A treating physician's opinion is entitled to controlling weight on the issue of the nature and severity of the claimant's impairment where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). "If there is 'substantial evidence' in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to 'controlling weight.' " Orn, 495 F.3d at 632 (citing 20 C.F.R. § 404.1527(d)(2). "In that event, the ALJ is instructed by § 404.1527(c)(2) to consider the factors listed in § 404.1527(c)(2)-(6) in determining what weight to accord the opinion of the treating physician." Orn, 495 F.3d at 632.

The factors to be considered include the " '[l]ength of the treatment relationship and the frequency of examination' by the treating physician, the '[n]ature and extent of the treatment relationship' between the patient and the treating physician, the '[s]upportability' of the physician's opinion with medical evidence, and the consistency of the physician's opinion with the record as a whole.' " Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting 20 C.F.R. § 404.1527(c)(2)-(6)). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Ghanim, 763 F.3d at 1161 (quoting Orn, 495 F.3d at 631).

Here, the ALJ did consider the length of the treatment relationship and the frequency of the examinations. (AR 24.) In considering whether Plaintiff's mental impairments were severe, the ALJ found that Plaintiff had been treated by Dr. Oestreicher for her depression since 2003. (AR 24.) The ALJ considered that Dr. Oestreicher's medical records demonstrated that Plaintiff's mental conditions were well controlled with medication, and on April 2015, at a four-

month follow-up, Dr. Oestreicher performed a mini-mental examination in which Plaintiff scored a 27, indicating mild mental impairment. (AR 24.) The ALJ also considered that there were no treatment notes from Dr. Hernandez or Ms. Mitchell that predate their opinions. (AR 25.) Ms. Mitchell's treatment notes were from a period of September 2014 through April 2015. (AR 25.)

In determining Plaintiff's residual functional capacity, the ALJ discussed that Dr. Oestreicher began treating Plaintiff for her fibromyalgia in 2012. (AR 28.) The ALJ also set forth the dates of Plaintiff's visits with Dr. Oestreicher and the physical findings in the record, where they were present. (AR 28-29.)

The ALJ found that the opinions of Dr. Oestreicher and Dr. Hernandez were not supported by medical evidence in the record and were not consistent with the medical record as whole. (AR 24, 25, 29-30.) Review of the decision demonstrates that the ALJ did consider the factors listed in section 404.1527(c) in determining the weight to be provided to the physician's opinions.

**E.     The ALJ Did Not Impermissibly Provide Her Own Lay Opinion**

In a footnote, Plaintiff contends that the ALJ rejected every medical opinion in the record in favor of her own assessment of the medical findings.[6] Defendant counters that controlling agency and Ninth Circuit authority establish that it is the ALJ, and not a treating, examining, or reviewing physician, who is responsible for determining the severity of a claimant's impairments and functional limitations.

It is error for the ALJ to define her own limitations for a plaintiff. See Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (the ALJ was not qualified as a medical expert and therefore could not permissibly go outside the record to consult medical textbooks for purpose of making his own assessment of the claimant's physical condition); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, . . . the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); Rohan v. Chater, 98 F.3d

---

[6] Plaintiff also argues in the opening brief that the ALJ relied on her own analysis of the raw medical data to reject the opinions of her treating sources. The Court notes that here the ALJ did not interpret raw medical evidence, but pointed out that there were no objective findings to support the limitations imposed.

966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). The ALJ is to determine credibility, resolve conflicts in testimony, and resolve ambiguities; however, her findings must be supported with specific and rational reasons. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).

As discussed above, the ALJ provided specific and legitimate reasons that are supported by substantial evidence in the record to support the finding that Plaintiff did not have a severe mental limitation. Therefore, the Court considers whether the physical residual functional capacity is supported by substantial evidence in the record. While Plaintiff does not clearly set forth her argument, the Court construes it as a challenge to the finding that Plaintiff has the capacity to perform light work as no doctor has made this specific finding.

The ALJ had two opinions addressing Plaintiff's residual functional capacity: Dr. Oestreicher's opinion which would preclude Plaintiff from work activity, (AR 418-420), and Dr. De la Rosa's opinion that Plaintiff had the capacity to perform medium work, (AR 100). As addressed above, the ALJ provided specific and legitimate reasons that are supported by the medical record to reject the opinion of Dr. Oestreicher.

The ALJ considered that the state agency medical consultant, Dr. Quint, found that Plaintiff did not have a severe physical impairment and another state agency medical consultant, Dr. De la Rosa, had found that Plaintiff had the residual functional capacity to perform medium work. (AR 31, 107.) The ALJ gave "little weight to Dr. Quint and De la Rosa's opinions because they did not have available for their review evidence present at the hearing level and consideration of her combination of impairments that may warrant greater functional limitations than was assessed." (AR 32.) The ALJ determined that based on Plaintiff's physical impairments, the medical record, and Plaintiff's partially accepted description of subjective complaints, Plaintiff retained the residual functional capacity to perform light work. (AR 32.)

While the ALJ gave little weight to the opinions of the medical doctors, they were considered, along with the medical record, in determining Plaintiff's residual functional capacity. The ALJ found that neither of the opinions accurately reflected Plaintiff's functional capacity as Dr. Oestreicher's opinion was too restrictive, and Dr. De la Rosa's opinion found capacity beyond which

Plaintiff retained. This is not a situation where the ALJ rejected all physician opinions and gave a less restrictive residual functional capacity. The ALJ gave some credit to Plaintiff's subjective complaints and found that did not have the residual functional capacity for medium work as opined by Dr. De la Rosa.

In developing the residual functional capacity, the ALJ considered Plaintiff's subjective complaints. (AR 27-28.) Plaintiff testified that she was able to lift and carry a gallon of milk. (AR 28, 57.) Plaintiff concedes that this suggest the ability to lift ten pounds but argues that it is not clear whether this is her maximum ability to lift or ability to lift occasionally in the context of an eight-hour work day. (ECF No. 10 at 15 n.2.) Plaintiff did testify that she was able to lift and carry a gallon of milk from the refrigerator to the counter and the ALJ's interpretation that this indicated Plaintiff retained the ability to lift and carry ten pounds frequently is rational.

Further, the ALJ considered that the objective findings in the medical record showed that while Plaintiff had tenderness over both forearms she had full range of motion, (AR 28, 29, 324, 469); and Dr. Parikh consistently found that Plaintiff's hands, wrists, elbows, arms, and shoulders were normal in appearance and mobility and non-tender,[7] (AR 29-30, 385, 481, 484, 488, 491).

While Plaintiff argues that there may be a different interpretation of the evidence, it is not for this Court to second guess the ALJ's findings where the ALJ made a rational interpretation of the evidence. Burch, 400 F.3d at 679. The Court finds that the ALJ did not impermissibly substitute her lay opinion and did not err in formulating Plaintiff's residual functional capacity assessment.

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ did not err in evaluating the medical opinions or in finding Plaintiff's symptom testimony to be not entirely credible.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Leticia C.

---

[7] As previously discussed, these records also consistently demonstrate Plaintiff had 4-5/5 grip strength.

1   Villafan.  The Clerk of the Court is directed to CLOSE this action.

2

3   IT IS SO ORDERED.

4   Dated:  **June 4, 2018**

                                             UNITED STATES MAGISTRATE JUDGE